UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 1:18-cr-109 (DRC) |
| - v. - | |
| SERGHEI VERLAN, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S SENTENCING MEMORANDUM

The defendant was the leader of a criminal enterprise that used a series of moving companies to exploit thousands of people across the county by demanding ransom for the personal possessions and cherished belongings those people had entrusted the enterprise to transport. For the reasons outlined, a Guidelines sentence is appropriate.

### BACKGROUND

**I.  The Offense Conduct**

    A.  Background on Moving Regulations

The U.S. Department of Transportation ("USDOT"), Federal Motor Carrier Safety Administration ("FMCSA"), monitors and enforces regulations governing safety and commerce for interstate motor carriers. A portion of the regulations governs the transportation of household goods by licensed motor carriers (*i.e.*, moving companies). *See* 49 C.F.R. Part 375. All household goods motor carriers engaged in interstate transportation of household goods must follow the regulations. 49 C.F.R. 375.101. Failure to comply with these regulations could result in the USDOT ordering the company to cease operating as a mover of household goods.

Interstate movers must also register with the USDOT. In order for a moving company to be registered with the USDOT, the moving company must apply to operate as a motor property

carrier and receive a USDOT number. The USDOT number is a unique identifier used to monitor a company's safety information acquired during audits, compliance reviews, crash investigations, and inspections. A moving company may not lawfully transport household goods without an approved USDOT number. During the relevant period, the application to operate as mover of household good was known as an OP-1 form, or later, Form MCSA-1, and was available through FMCSA. On the OP-1 and MCSA-1 forms, all applicants must disclose, under penalty of perjury, any relationship with any other FMCSA-regulated entity within the past three years, including any ownership interests or management positions.

Under those regulations, carriers must provide all moving estimates for household goods to potential customers in writing and must indicate clearly whether the estimate is binding or non-binding. 49 C.F.R. 375.401. With a binding estimate, the customer and the moving company must both agree in writing to a fixed charge for all services prior to the start of any work. 49 C.F.R. 375.403. The moving company may re-negotiate the contract with the customer if the moving company believes after an on-site inspection that the weight of the actual shipment significantly exceeds the original estimate, but this re-negotiation must be done before any work is commenced and with the customer's full consent and knowledge. 49 C.F.R. 375.403. The moving company is expressly barred under the regulations from amending the estimate after loading the shipment. 49 C.F.R. 375.401. Failure to deliver a customer's shipment upon the customer's offer to pay the binding estimate amount (plus additional charges not relevant here) constitutes a failure to transport a shipment with "reasonable dispatch" under the regulations and subjects the moving company to "cargo delay claims." 49 C.F.R. 375.403.

Pursuant to federal regulations, movers must deliver household goods "in a timely manner." 49 C.F.R. 375.601. Unless the requirement is waived, movers "must tender a shipment

for delivery for an individual shipper on the agreed delivery date or within the period specified on the bill of lading." 49 C.F.R. 375.603.

Moving companies must follow the regulations and allow for regular inspections by federal regulators. Failure to meet the requirements set by USDOT can result in a moving company being placed out of service. A company placed out of service is no longer authorized under federal law to operate as a mover of household goods.

    B.    The Enterprise

The charged criminal enterprise, led by the defendant, flouted these regulations. In doing so, over the course of five years, the criminal enterprise presented itself as at least 12 different moving companies,[1] and profited from the exploitation and manipulation of thousands of victims. (*See* Presentence Report ("PSR") ¶¶ 22–33, 38, 39). Those victims hired the enterprise to move them, based on false representations and assurances by the enterprise members, as well as federal certifications obtained through fraud. (*See id.* ¶ 38). The enterprise lured victims into binding contracts, containing square footage estimates that were purposefully low, and then revised contracts upward during the move. (Change of Plea Hearing, Doc. 268, PageID 1868–70.) The enterprise then extorted the victims into paying more than contracted for based both on falsely inflated square footage numbers, but also by capturing the victims' goods on moving trucks before increasing the price for the moves. (PSR ¶ 40–41).

---

[1] The companies, with their authorized operation dates, are: JBR Underground doing business as United National Moving and Storage (2008 – 2015); National Relocation Solutions (2014 – 2015); Independent Van Lines (2014 – 2015); National Relocation Van Lines (2014 – 2015); US Relocation Systems (2015 – 2016); First National Moving and Storage (2016); Public Moving and Storage (2016 – 2017); Public Moving Services (2017); Smart Relocation Solutions a/k/a Presidential Moving Services (2017 – 2018); Unified Van Lines (2017 – 2018); and Flagship Van Lines (2018). (PSR ¶¶ 22-32).

Whenever the aftermath of their crimes became too complicated and messy, the enterprise simply shed its skin and reincorporated as a new entity, with lies on their websites and documents about their experience, and lies on their federal forms about ownership and accountability. (*See id*. ¶ 38; Indictment at 7-9). They shielded their members by assigning them new names, and abandoning the phones and contact information of their tainted prior form. (*See* Indictment at 8; Exhibit 1 (listing "aliases," new phone numbers, and new emails for employees)).

The completeness of their frauds, the thoroughness of their lies, enriched the enterprise handsomely. The conservative loss amount in this case is over $2.4 million. (PSR ¶ 45).

      C.      <u>The Defendant's Role</u>

The defendant was one of the two bosses running the enterprise. (Doc. 268, PageID 1852–53.) He ran the enterprise with Andrey Shuklin principally out of the headquarters in Hollywood, Florida; however, the enterprise managed warehouses throughout the United States, including in the Southern District of Ohio. (Doc. 268, PageID 1853–54.) The defendant's name was on bank account and financial information, he controlled money into the enterprise, and he received documents and emails relating to the crimes set forth in the Indictment. (PSR ¶ 42.) Along with Shuklin, he enjoyed the financial spoils of the complex fraud, spending money straight out of the corporate bank account on himself. (*Id*. ¶ 42; Doc. 268, PageID 1855.)

He also repeatedly lied to federal agents and regulators from the Department of Transportation about the moving enterprise and his role. This included his efforts "reincarnating" into "new companies" through fraud during the time he was the owner. (Doc. 268, PageID 1858–59, 1866.) When one entity was placed out of service by USDOT, the defendant and the enterprise simply started a new company under the name of a fake owner and registered the new company in a different state, with listed business locations in Ohio, Maryland, North Carolina, Illinois, Texas, California, Connecticut, Colorado, and Missouri. (PSR ¶ 39; Doc. 268, PageID 1859, 1866).

He knew it was part of the scheme to give customers an "unprofitable rate" on the front end to induce them to hire the company and then increase the price through fraud during the move. (Doc. 268, PageID 1872.)  The defendant incentivized the fraudulent overcharging of customers by tying the foreman's compensation to the amount of cubic feet charged by the enterprise. (*Id*. at PageID 1868.)  He knew that employees of the enterprise justified new charges to customers by purposefully packing the truck to make it appear that the customer's goods took up more space than was actually being used. (Doc. 268, PageID 1869.)  This defrauded the customers by tricking them to pay for more cubic space during the moves. (*Id*. at PageID 1870–71.)

The defendant was one of the select few within the company who received emails showing the real cubes (*i.e.*, the actual space a customer's goods used during a move) versus the fraudulent, inflated cubes charged to customers. (PSR ¶ 40.)  The defendant knew this was central to the scheme. (Doc. 268, PageID 1864.)  He knew the enterprise was overcharging customers during moves, and instructed employees to cap the overcharge at 20% to keep customer complaints down. (*Id*. at PageID 1864–65.)

The defendant also furthered the enterprise by paying employees to write "fake positive reviews" of moves performed by the moving enterprise to create the misimpression to customers that the company provided high-quality services. (*Id*. at PageID 1856–57.)  As the enterprise received negative reviews from customers, the defendant was involved in changing the enterprise's name and making false statements to customers and federal regulators as to the identity of the true owners—namely, the defendant and Shuklin. (*Id*. at PageID 1857–59.)  The defendant would pay employees in order to use their names and identifying information so they could falsely represent that these employees actually owned the enterprise. (*Id*. at PageID 1859–60.)  He was directly responsible for opening "new" affiliated companies and managing the companies' "online image" through false statements. (*Id*. at PageID 1866–67.)  The defendant conspired with other members

5

of the enterprise to secure leads through a third-party company by creating and using fraudulently-altered images of driver's licenses. (PSR ¶ 41.)

On June 1, 2017, agents from the DOT and FBI executed a search warrant at the Florida headquarters of the moving enterprise, and both the defendant and Shuklin were interviewed. Nevertheless, the fraudulent moves and reincarnations of the moving enterprise continued after the interview and search warrant. The defendant made no effort to stop it and no effort to walk away. Instead, he continued running the corrupt enterprise and spending the proceeds, until fleeing the country in response to the Indictment in August 2018. (PSR ¶ 44.)

The defendant and his partner Shuklin directed the multi-state, multi-year fraud and benefitted handsomely while thousands of victims suffered irreparable harm. The defendant and Shuklin are the most culpable members of this criminal organization.

## II. The Defendant's Plea and Guidelines Range

The defendant pleaded guilty before this Court on October 17, 2022.

Probation has calculated the defendant's Guideline range as follows (*see id.* ¶¶ 53-68):

Count One: 18 U.S.C. § 1962(d) – RICO Conspiracy

- The United States Sentencing Commission Guidelines Manual ("U.S.S.G."), effective Nov. 1, 2018, applies to this conduct.

- Pursuant to U.S.S.G. § 2E1.1, the base offense level is either 19, or the offense level applicable to the underlying racketeering activity, whichever is higher. Pursuant to U.S.S.G. § 2E1.1, Application Note 1, such determination is made by applying Chapter 3 Parts A, B, C, and D.

- The underlying racketeering activity applicable to the defendant is wire fraud, which is governed by U.S.S.G. § 2B1.1. Pursuant to § 2B1.1(a)(1), the base offense level is 7, because wire fraud has a statutory maximum penalty of 20 years' imprisonment.

- Pursuant to U.S.S.G. § 2B1.1(b)(1), because the loss exceeded $1,500,000, and was less than $3,500,000, 16 levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(2), because the offense involved 10 or more victims, 2 levels are added.

6

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the scheme involved sophisticated means, two levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(11)(B)(ii), because the offense involved the production or trafficking of any authentication feature, two levels are added.

- Pursuant to U.S.S.G. § 3B1.1(a), because the defendant was a leader or organizer of a criminal activity that involved five or more participants, or was otherwise extensive, four levels are added.

- The USAO does not oppose a two-level reduction in offense level pursuant to U.S.S.G. § 3E1.1 based upon the defendant's acceptance of responsibility, provided that the defendant's conduct continues to demonstrate compliance with the terms of § 3E1.1. The defendant may be entitled to an additional one-level decrease pursuant to § 3E1.1(b) in recognition of the defendant's timely notification of his intention to plead guilty.

In accordance with the above, Probation calculated the total offense level at 30, and the defendant does not object to this calculation. (*Id.* ¶ 68.) Probation calculated the defendant's criminal history as I. (*Id.* ¶ 74.) The defendant's Guideline range then is 97 to 121 months' imprisonment. (*Id.* ¶ 104). The Government agrees with Probation's Guidelines calculation.

## DISCUSSION

### III. The Contested Facts in the PSR

The defendant has challenged facts in three paragraphs in the PSR. "In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

**Paragraph 44 (PSR at page 1, 10): Verlan fled to the Bahamas**. Paragraph 44 states that, following the Indictment in this case, in September 2018, the defendant fled to the Bahamas through a charter boat, then flew to Panama, where he intended to fly to Turkey, before landing in his home country, Moldova. (PSR ¶ 44.) The defendant contests the notion that he "fled" the United States. The government's position is that leaving the country after learning of a

7

racketeering Indictment that shut down the company he owned (a copy of which was found on his phone), in the manner he left, is proof of his flight. (*See* Doc. 19, Doc. 43, Doc. 44 (motion and orders relating to post-Indictment restraining order precluding enterprise from disposing of household goods) To the extent the defendant contests this fact at sentencing, the government intends to introduce witness testimony and the defendant's proffer statements.

**Paragraph 36 (PSR at page 7): Extortion and Theft of Goods**. Paragraph 36 states, in relevant part, that "customers were extorted and their household goods, at times, were stolen." (PSR ¶ 36.) As set forth in the Indictment, the enterprise furthered the scheme by "extort[ing] customers into paying money to the Moving Enterprise by increasing the cost of moves after loading customers' household goods and by refusing to relinquish customers' household goods until customers paid an inflated price for delivery of the household goods." (Indictment, Doc. 3, PageID 30, 33); *see* 18 U.S.C. § 1951(b)(2) (defining extortion as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear"); *United States v. Campbell*, 761 F. App'x 476, 480 (6th Cir. 2019) (explaining "'fear' includes the 'fear of economic harm'—which means that 'the victim believes that the defendant can exercise his or her power to the victim's economic detriment'") (quoting *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006)).

The enterprise would extort victims by threatening to keep their goods—after loading the goods on the moving truck, and then jacking up the price of the move—if the victims did not pay the fraudulent price. *See, e.g.,* Exhibit 2, Exhibit 3 (moving documents and reports detailing two moves). The foreman who loaded the goods and then the business personnel in Hollywood, Florida, demanded the higher price after the goods were loaded. (*See, e.g.,* Plea Agreement V. Pestereanu, Doc. 136, PageID 696 ("[A]s a foreman, PESTEREANU knew that the Moving Enterprise was refusing delivery of some customers' household goods based on the fraudulent

charges that were added after customers signed binding estimates."); Plea Agreement P. Ricci Quincoces, Doc. 183, PageID 908 (admitting "the Moving Enterprise would refuse delivery of customers' household goods until after customers paid the inflated amount, wrongfully obtaining property from customers through fear of economic harm"). During execution of search warrants following the Indictment in this case, agents recovered the household goods of over 50 victims whose goods the enterprise refused to deliver from moves dating as far back as 2015. (PSR ¶ 45.)

All of the defendants who have pleaded guilty to the Indictment have agreed to this conduct. Their plea colloques bear sufficient indicia of reliability for this Court to rely on their accuracy. *See, e.g.*, *United States v. Moncivais*, 492 F.3d 652, 658-60 (6th Cir. 2007) (no error where district court relied on coconspirator's proffer statements during defendant's sentencing); *see also United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006) (noting "long-settled rule of law that Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings"). Beyond these sworn statements, to the extent the defendant contests these facts, the government intends to present witness testimony at sentencing.

**Paragraph 43 (PSR at page 9-10): Baltimore Threat**. As set forth in the Indictment, "[o]n or about June 15, 2017, during a telephone call to a third-party company located in Maryland, VERLAN threatened to blow up a building owned by the third-party company and shoot the third-party company's employees." (Indictment, Doc. 3, PageID 36.) This is based on an interview of a witness who worked for the company that leased a Baltimore, Maryland warehouse to the enterprise and was threatened by the defendant, and is corroborated by police reports documenting the threat. (*See* Exhibit 4 (report of witness interview and police report).) To the extent the defendant contests these facts, the government intends to present witness testimony at sentencing.

9

### IV. The Defendant's Conduct Warrants a Guidelines Sentence

The factors that the Court must consider when fashioning a sentence include the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the defendant's offense, the promotion of respect for the law, the need for just punishment for the offense, and the need for adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). All such considerations support a Guidelines sentence for the defendant's crimes.

#### A. The Defendant's Crimes Harmed Myriad Victims

The nature and circumstances of this offense are serious. Over the course of five years, the defendant and his criminal enterprise defrauded and exploited thousands of victims.[2] The victims vary in age, status, employment, and numerous other metrics, but are united in one simple way—they all were trying to move safely and efficiently their most precious, personal possessions from one home to another. They were seeking new refuge, whether it was down the street or across the country, and they entrusted the members of the criminal enterprise to help them reach it.

The victims were not naïve in hiring the enterprise; it was the enterprise that ruthlessly manipulated the means through which even the most diligent customer would seek to investigate them before hiring. If victims went to the affiliate companies' websites, they would see false declarations, like the newly-formed company was celebrating its 20th anniversary. (*See* Exhibits to Gov.'s Sentencing Memo A. Shuklin, Doc. 231-3, PageID 1457–59.) If the victims went to review websites, they would read glowing missives penned by the criminals themselves, describing how "great" and "professional" the company was. Even if the victims went to the U.S. Department of Transportation, they would find USDOT numbers for the affiliated companies, acquired through misrepresentations and lies.

---

[2] The victim impact statements that have been received by the Government have been provided to Probation.

10

After doing their research, the victims were then drawn in by promises of low rates and prompt deliveries. They booked binding estimates, which were supposed to be just that. They relied on the members of the enterprise, not knowing the people they were speaking to in the sales office were using fake names, and the numbers they were calling would one day just stop working, the repeated rings ignored by the same people who were offering false assurances. (*See* Exhibit 1).

After signing the contracts, the victims then made plans, dependent on their belief that the criminal enterprise would do what it claimed it would do. The victims purchased homes, signed leases, made arrangements with employers, babysitters, family members. They prepared themselves for the stresses and challenges that come from even the most efficient and fair moves.

On the day of the victims' appointed moves, members of the criminal enterprise came into their homes, boxed up their most personal and cherished possessions, and loaded them up on trucks. Then they changed the deal. They claimed the loads were bigger than they were. They claimed the square footage was off. They demanded payment upfront, and signatures on documents falsely asserting that any change had been agreed to prior to loading. They threatened to unload, or not deliver, the victims' possessions. (*See* Exhibit 2, Exhibit 3).

What were the victims to do then? They stared into loaded trucks containing their "household goods," terms of art that contain much more than those words suggest. Household goods in this case means diplomas, baby books, irreplaceable family heirlooms, even relatives' ashes. In those moments when the victims were at their most vulnerable, they agreed to whatever they needed to in a sometimes vain attempt to keep hold of those items that enriched and documented their lives.

Some of those victims received their goods, after paying more than they should have. Some of those victims never did, left to seek reimbursement for items that can never be replaced, whose value can never be calculated in simple dollars.

After all this, those victims then had to rebuild their lives in their new home, knowing they had been defrauded in their most vulnerable moment, held hostage by an enterprise that viewed such violations as a business model.

These tragedies played out again and again and again. By the case agent's calculation, approximately 90% of moves conducted by the enterprise and subject to the agent's analysis were fraudulent. (*See* PSR ¶ 45). With deception this pervasive, the members of the enterprise all knew what was going on. Together, they profited off of the exploitation of thousands of people. And they did it over multiple years.

The defendant was the head of this enterprise. He knew what was happening, and he directed it. He financially benefitted more than other members of the enterprise, spending money on himself straight out of the corporate bank accounts. The enterprise operated under his leadership and for his benefit.

B. The History and Characteristics of the Defendant Support a Guidelines Sentence

The defendant is an educated man. He graduated from university in Moldova and studied "management, engineer, and international transportation." (PSR ¶ 97).

He was more than capable of succeeding in business without taking advantage of thousands of people. But instead of applying his intelligence and education to legitimate work, he instead spent years abusing and extorting victims when they were at their most vulnerable.

Then, when he realized he was caught in the act, he fled. He took a boat to the Bahamas; he then flew to Panama, where he intended to ultimately flee to his home country. After years of

12

taking advantage of others, he would have rather become a fugitive than be held to account for his criminal activities.

### C. A Guidelines Sentence Deters Other Bad Actors in the Moving Industry

During his change of plea, the defendant attempted to put blame on the "industry," as if he was forced to commit fraud and extortion because everyone else was doing it. (Doc. 268, PageID 1861.) He even implored, "something needs to be done about it." (*Id*. at PageID 1862.) This case is what is being done about it—the general deterrence that results when the bad actors in the moving industry who defraud and extort unknowing victims recognize the consequences of these actions.

The criminal enterprise defrauded customers in a way the FMCSA labels "common" within the moving industry.[3] A June 2020 study conducted by the Better Business Bureau reported that FMCSA received 4,780 complaints related to moving companies in 2019.[4] The Better Business Bureau reported "[a]t least 1,335 moving companies have earned an 'F' rating from BBB due to unresolved or unanswered complaints, unusually large amounts of complaints, and other factors." In their estimation, "[t]he general public is at serious risk of encountering a dishonest moving operation[.]"

Only meaningful penalties will possibly deter the numerous bad actors in the moving industry. Only serious consequences will possibly prevent fraudsters from preying on a large and

---

[3] FMCSA, "File a Moving Fraud Complaint," available at: https://www.fmcsa.dot.gov/protect-your-move/file-a-complaint ("There are many kinds of moving fraud. One of the most common is when a 'rogue' mover provides a low cost quote to perform an interstate move, loads your goods onto their truck, and then claims your load is over the weight estimate and the additional weight will be charged at an exorbitant price per pound. Consumers are forced to pay double or higher the original estimate just to get their belongings back.").

[4] BBB, "Know Your Mover," available at: https://www.bbb.org/globalassets/local-bbbs/council-113/media/scam-studies/bbb-movers-scam-study.pdf.

particularly vulnerable population. Only a term of incarceration will possibly convince other corrupt movers to operate in accordance with the federal regulations designed to protect the millions of Americans who move each year.

The need for deterrence and to promote respect for the law supports a Guidelines sentence, particularly for the leader of the multi-year criminal enterprise that victimized thousands of people.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a Guidelines sentence in this case is appropriate.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

*/s/Matthew C. Singer*
MATTHEW C. SINGER
MEGAN GAFFNEY PAINTER
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

## **CERTIFICATE OF SERVICE**

  The undersigned attorney, duly admitted to represent the United States before this Court, hereby certifies that on the below date, he caused the Government's Sentencing Memorandum to be served on counsel for the defendant electronically.

Dated:  Cincinnati, Ohio
     December 12, 2022

                Respectfully submitted,

                */s/Matthew C. Singer*
                Matthew C. Singer
                Assistant United States Attorney