United States District Court
Southern District of Ohio
Western Division

| | |
|---|---|
| United States,<br><br>   Plaintiff,<br><br> v.<br><br>Serghei Verlan,<br><br>   Defendant. | Case No. 1:18-cr-109<br><br>District Judge Douglas R. Cole |

Sentencing Memorandum of Defendant Serghei Verlan

  Defendant Serghei Verlan ("Mr. Verlan") has entered a plea to Count 1 of the indictment charging him with a Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, a Class C Felony, in violation of 18 U.S.C. §§ 1962(d) and 1963(a). This matter is scheduled for sentencing on the afternoon of December 19, 2022. Mr. Verlan submits the following memorandum for the Court's consideration in determining his sentence. Specifically, Mr. Verlan asks the Court to consider a sentence of time served, equivalent to approximately 60 months.

<u>Sentencing Memorandum</u>

*A. Introduction*

  Mr. Verlan came to the United States from the former Communist Bloc when he was 24 years old seeking a better life for himself. He had difficulty finding work but persevered, moving around the United States trying to find somewhere that he could make a life. Mr. Verlan ultimately settled in Florida in 2008 when he was around 25 years old. He later met two men from his home country of Moldova who worked as movers, and they helped him get a job with the company they

worked for. Mr. Verlan spent several years as laborer in that industry, working hard but earning only modest income. Over time, Mr. Verlan began to believe that if he were given the opportunity, he could run a moving company of his own and become the master of his own destiny.

Opportunity knocked for Mr. Shuklin when he connected with Mr. Andrey Shuklin in 2013 and the two men decided to go into business. Mr. Shuklin's mother gave Mr. Shuklin $40,000 which the two men used to buy a moving company from an older gentleman who was retiring from the industry. Unfortunately, the moving industry proved more difficult than either of the two had imagined. Competition was fierce and the industry was fraught with fraud and deceptive business practices. Though Mr. Verlan never set out to do anything more than make a living, he and Mr. Shuklin were soon running a company engaged in the criminal conduct which landed them before the Court.

The Presentence Investigation Report ("PSR") prepared in this matter calculates a guideline sentencing range which is greater than necessary to accomplish the goals of sentencing as set forth in 18 U.S.C. § 3553(a). Mr. Verlan respectfully asks the Court to consider the circumstances of his life, the overstated guideline range, and the nature of the circumstance of the offense, when fashioning a sentence which is sufficient, but not greater that necessary, to comply with the purposes of sentencing. The Court has already done much of the heavy lifting when it sentenced Mr. Shuklin to 78 months. Mr. Verlan submits that he deserves a lesser sentence than that imposed upon Mr. Shuklin. That position is based upon meaningful differences which exist between Mr. Verlan and Mr. Shuklin, both as to their actions during the conspiracy and how the sentences imposed will impact each of them following imposition. These issues will be addressed in detail below. For its part, the prosecution has acknowledged that, "[Mr. Shuklin] was the head of this enterprise. He knew what was happening, and he directed it. He financially benefitted more

than any other member of the enterprise, spending money on himself straight out of the corporate bank accounts." (Gov. Sentencing Memo re. Shuklin, Doc. 231 at PAGEID #: 1450)

B.      *Process for Choosing the Ultimate Sentence*

    (1)     The guiding principles of 28 U.S.C. § 3553(a)

The Sentencing Reform Act ("the Act"), 18 U.S. C. §3551 et. seq., imposes an "overarching instruction" that district courts must select a sentence which is "sufficient but not greater than necessary" to achieve the sentencing goals outlined in §3553(a)(2). *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007). Those goals include the need for the sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (B) afford adequate deterrence to criminal conduct, (C) protect the public from future crimes of the defendant, and (D) provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Gall v. United States*, 128 S. Ct. 586,597 at n.6 (2007).

To arrive at a sentence that serves these goals without being greater than necessary, the Act directs district courts to consider the many factors listed in §3553(a)(1)-(7). Section 3553(a)(1) begins with the broad command to consider the nature and circumstances of the offense and the history and characteristics of the defendant. Sections §§ 3553(a)(2) and (3) require the district court to consider both the need for the need for the sentence imposed and the various types and ranges of sentence available to the sentencing court. Sections §§ 3553(a)(4) and (5) require the district court to consider the advisory Sentencing Guidelines range and relevant policy statements by the Sentencing Commission. It is important to note, however, that these guidelines can provide only a "rough approximation" of what might be an appropriate sentence. *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007). Section 3553(a)(6) requires the district court to consider the need to

avoid unwarranted disparities in choosing a sentence. This necessarily encompasses a corresponding duty to embrace "warranted" disparities amongst defendants who are *not* similarly situated. *See Gall*, at 600. Finally, §3553(a)(7) requires the court to consider the need for restitution, if applicable.

Taken together, these considerations, often referred to as "the 3553 factors," are more than a laundry list of discrete sentencing factors. Rather, they comprise "a tapestry of factors, through which runs an overarching principle" - the court's duty to "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriquez*, 527 F.3d 221, 228 (1st Cir. 2008). Each of these factors will be discussed in greater detail below where relevant to these circumstances.

    (2)    <u>The broad autonomy of this Court to select a sentence</u>

In *Gall v. United States*, 128 S. Ct. 586,598 (2007), the Supreme Court held:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

The *Gall* Court envisioned that a district court would normally begin its analysis by accurately calculating the Guideline range, but then consider why that Guidelines sentence ought not apply in an individual case – i.e. because the guideline itself fails properly to reflect §3553(a) considerations, reflects an unsound judgment, does not treat a defendant's characteristics in the proper way, or that a different sentence is appropriates regardless. *Rita*, at 2468. The Court specifically held that a district court "may not presume that the Guideline range is reasonable," and cannot "require 'extraordinary circumstances' to justify a sentence outside the Guideline range." *Gall*, 128 S. Ct. at 596-67; *United State v. Bolds*, 511 F.3d 568, 580-81 (6th Cir. 2007).

4

Rather, each sentencing judge "must make an individualized assessment based on the facts presented and upon a thorough consideration of all the §3553 (a) factors." *Id*. at 580 quoting *Gall*, 128 S. Ct. at 597. Although the Sentencing Commission "fills an important institutional role" in promulgating the Guidelines, the sentencing judge "has greater familiarity with the individual case and the individual defendant before him…[and] is therefore in a superior position to find facts and judge their import under §3553 (a) in each particular case." *Kimbrough,* 128 S. Ct. at 574. In short, the Supreme Court places nothing off limits for district courts to properly consider when reaching their ultimate sentencing decision.

C.      *Factors for Consideration in Choosing the Sentence*

     (1)      The history and characteristics of Mr. Verlan

Mr. Verlan appears to have had an honest, albeit difficult upbringing - one defined in large part by the random chance of his birth in the Republic of Udmurtia. He lived there until his family fled Russian invasion when he was 8 years old. A that time, his family re-located to Moldova where his father had been born. Life in Moldova was difficult, however, as the PSR describes him being raised surrounded by poverty and violence. Mr. Verlan was finally given a chance to improve his life when he secured a visa to enter the United States in 2007 when he was 24 years old. Mr. Verlan came to the United States presumably full of the hopes shared by millions of other immigrants, and simply looking for the opportunity for safety and prosperity.

The reality was not so rosy unfortunately. Mr. Verlan moved from place to place looking for work living in New York, Pennsylvania, Colorado, and Florida over the years. His situation worsened when his visa expired and Mr. Verlan was legally required to return home. He applied for political asylum but was denied and ultimately choose to remain in the United States without a legal status. Mr. Verlan was homeless on three separate occasions before finally landing in the

5

Miami, Florida area where he was able to secure work as a laborer for a moving company. As mentioned above, Mr. Verlan had met two young men from Moldova who worked for a moving company and were able to get him a job working with them. He made a flat $100 per day and the days were long and hard. It was around this time in 2013 when Mr. Verlan met Mr. Shuklin and the two of them elected to start a moving company. Their aspirations were unfortunately greater than their aptitudes, however. The company grew rapidly right along with its operating costs. The company was struggling to make expenses and the two men soon began to engage in the offense conduct which landed Mr. Verlan before the Court facing sentencing.

    (2)    <u>The nature and characteristics of the offense</u>

Mr. Verlan has plead guilty and readily acknowledges the harm that his criminal conduct had upon the victims of this conspiracy. He recognizes that myriad individuals (1,900 estimated by the PSR) were victimized by the Enterprise's price-hiking scheme and 58 of those never received their property at all. Those 58 lost what was literally a lifetime of possessions and memories.[1] With that in mind, wholesale fraud or the "theft" of good through "extortion" was never the goal of the Enterprise. Rather, the goal of the conspiracy was to "bump" the price on each move just enough that the customer would pay it rather than make a stink. The non-delivery of merchandise, a complaint to a federal regulator, or even a scathing online review was bad for business. In fact, those were precisely the sort of things that would necessitate the re-branding of the company under a different name - no small task to be sure. Mr. Verlan estimates that the Enterprise successfully delivered 10,000 moves during the scope of the conspiracy. While most of these individuals likely had their bills "bumped," it does draw into question the line between

---

[1] It is not discussed in the PSR, but upon information and belief, many of the 58 individuals who lost their property filed insurance claims which compensated them for the raw financial aspects of their loss. This is no way implies that they were made whole, but it is worthy of the Court's acknowledgement.

6

raw criminality and commercial transactions done under shady circumstances. As stated above, however, Mr. Verlan has accepted full responsibility for his crimes. The Court is merely asked to consider the nature and characteristics of this offense as part of its overall sentencing consideration.

      (3)    <u>The kinds of sentences available</u>

The Court is asked to consider the conditions of Mr. Verlan's confinement as it determines a just sentence. Said another way, a sentencing court ought to consider the impact of a particular sentence upon a defendant as it determines a sentence because different sentences impact defendants differently. These differences are based upon the circumstances surrounding each sentence and each defendant. Consider two hypothetical defendants: Defendant #1 is sentenced to 5 years in the BOP but is allowed to self-surrender to the institution. Defendant #1 classifies as low or minimum security because theirs is a non-violent fraud offense such as Mr. Verlan's. Defendant #1 will spend their entire sentence in the far more beneficial environment of the BOP which includes classes and programming, library access, educational and vocational opportunities, better food and medical care, and the ability to exercise and maintain personal and spiritual heath. All of this is provided in a more campus-like environment where an inmate can actually move around and feel the sun upon their face.

Compare the above to Defendant #2 who is detained in the Butler County Jail while their case is resolved. That defendant is locked down for 23 hours of every day in a small room with 15 other inmates. There is no programming, no education, *extremely* limited access to medical care, little to no access to exercise, and *zero* access to fresh air or sunshine. Local jails such as Butler County are simply not designed to provide long-term housing in the same way a penitentiary is. While they presumably meet constitutional muster, the difference in the quality of life provided is significant. While some corrective nature is part of any criminal sentence, we as a society are

7

hopefully focused upon the rehabilitative aspect of any criminal sentence. If nothing else, a district court ought to consider the conditions of confinement given the sentence imposed.

Mr. Verlan has been detained in the Butler County Jail since his transfer to the Southern District of Ohio in December 2018. All told, Mr. Verlan will have been in custody for 4 years, 3 months (51 months) by the time he stands before the Court for sentencing. That time is in no way equivalent to a similar period of custody in the BOP as contemplated by the blunt tool of the sentencing guidelines. The Court is asked to take this into consideration along with all the other sentencing factors when determining a final sentence.

(4) The Advisory Sentence Guidelines

As outlined above, the Supreme Court has contemplated a procedure whereby a district court ought to correctly calculate and consider the advisory sentencing range before beginning in earnest the daunting task of considering all the circumstances surrounding an individual defendant and his or her offense before reaching the ultimate sentencing decision. Once that calculation is reached, the district court must then analyze whether there are any bases to believe that the guideline range either under- or overstates the severity of the conduct at issue. In that circumstance, the district court is authorized to utilize a sentencing variance to address any inaccuracy or misrepresentation. Said another way, once the advisory guidelines are calculated and considered, this Court has the ultimate decision as to what sentence is just and proper.

The driving force behind the high offense level in this case is the 16-level enhancement applied as a result of the approximately $2.5M loss amount. Mr. Verlan respectfully submits that this aspect of the guideline calculation overstates the severity of the conduct at issue. First, the guideline utilized to calculate that enhancement, U.S.S.G. § 2B1.1(b), is a blunt tool used to

8

estimate the criminal impact ranging from intended loss with zero actual financial impact, to the actual theft of currency or its electronic equivalent.

There are multiple factors in this case which cause the loss figure used to be an inaccurate overstatement of the conduct at issue. For example, though it has received little attention throughout this case, the Enterprise operated a post-sale customer service department. The goal of this department was largely to address complaints from customers who had the price of their job "bumped" by the foreman overseeing their move. As the Court can certainly imagine, the first action taken by many victims was to call the company the next business day to demand an explanation and, just as likely, a refund. The customer service representatives were trained to offer the customers discounts and free services in an effort to assuage their anger. Keep in mind, the goal of the conspiracy was to fraudulently increase profits without acting so greedily that customers took action which threatened the operation of the Enterprise. Mr. Verlan acknowledges that the discounts being offered were essentially paying the customers back with their own money, but substantial sums were nonetheless returned. In some cases, if the customer complained loudly enough, the Enterprise would discount the job all the way back down to the original estimate just to avoid the potential repercussions. While this does little to offset the loss that was intended by the scheme, it does go to prove the overstatement of the actual loss in this case.

It is also worth considering the actual value of the services being provided by the Enterprise. Upon information and belief, the Enterprise represented the "economy class" of moving companies and often landed its customers by simply underbidding every other competitor, regardless of the actual costs involved in the move. The Enterprise thereby placed itself operating at a below-cost level which required "bumps" just to return it to profitability. Consider this example: A customer calls a large nations carrier (i.e. United, Mayflower, Atlas, etc.) and receives

a fair bid for a job of $10,000. That customer, looking for a good deal, then shops around and ultimately contacts the Enterprise which offers to do the same job for $8,000. The customer jumps at the 20% saving and books with the Enterprise. All is well and good until the move is ultimately "bumped" to $11,000 pursuant to the scheme. The Guidelines would view that as a $3,000 loss regardless of the fair value of the services rendered. And what if the customer called customer service and ultimately received a $1,000 credit, i.e. paid a fair market value of $10,000 for the move? While Mr. Verlan understands and accepts that all customers had a right to honesty and fair dealing, this does again support the notion that the loss figure utilized by the PSR likely overstates the actual loss and criminality in this case.

  (5) <u>The need to avoid unwarranted disparities in sentencing</u>

One of the most challenging aspects of sentencing is the avoidance of unwarranted disparity amongst individuals with similar facts and circumstances. However, when viewed in the inverse, that same principle requires that individuals with different facts and circumstances deserve difference sentences. Here, Mr. Verlan asks the Court to focus its consideration upon the *warranted* disparities that exist between he and Mr. Shuklin who was sentenced to 78 months. Mr. Verlan submits that the different facts and circumstances which exist between the two men warrant the 18-month shorter sentence which he is asking the Court to impose.

  a. *Involvement in the conspiracy itself*

Mr. Verlan and Mr. Shuklin started the Enterprise together and both were responsible for its operation and management. There are, however, several distinct differences which militate against the two of them receiving the same sentence. First, Mr. Shuklin was the financial instigator of the Enterprise. While Mr. Verlan had experience as an actual mover, it was Mr. Shuklin and the $40,000 gift from his mother that founded the Enterprise. Second, while both men were

responsible for the operation of the Enterprise, there was a hierarchy even between the two of them.  In its sentencing memorandum related to Mr. Shuklin, the Government specifically noted that, "[Mr. Shuklin] was the head of this enterprise. He knew what was happening, and he directed it." (Gov. Sentencing Memo re. Shuklin, Doc. 231 at PAGEID #: 1450)  While Mr. Shuklin was likely #1-A and Mr. Verlan a close #1-B, a distinction is still a distinction.  Third, Mr. Shuklin, perhaps as the financial founder of the company, obtained greater financial reward from the Enterprise than any other co-Defendant, specifically including Mr. Verlan.  In its sentencing memorandum related to Mr. Shuklin, the Government noted that, "[Mr. Shuklin], more than anyone else, enjoyed the financial spoils of the complex fraud, spending money straight out of the corporate bank account on himself." (Gov. Sentencing Memo re. Shuklin, Doc. 231 at PAGEID #: 1437)  And later in their brief, the Government reiterated that, "[Mr. Shuklin] benefitted more than any other member of the enterprise." (Gov. Sentencing Memo re. Shuklin, Doc. 231 at PAGEID #: 1450)  Finally, it is worth noting that Mr. Shuklin had greater control of the finances of the Enterprise, while Mr. Verlan's role was apparently more operational in nature.  In its sentencing memorandum related to Mr. Shuklin, the Government noted that, "[Mr. Shuklin] and his wife were the signatories on a Bank of America account called "Moving National Solutions LLC DBA Public Moving and Storage."  This is further supported by the PSR which indicated, "It should be noted, during the last year of the conspiracy, all bank accounts associated with the Moving Enterprise were in the name of Andrey Shuklin." (PSR, Doc. 274 at ¶ 42, PAGEID #: 1912)  This supports Mr. Verlan's assertion that he was barely coming into the office toward the end of the conspiracy.  It is therefore apparent that Mr. Shuklin was not only controlling the finances, but benefiting more from them than Mr. Verlan.  All of the above distinctions lead to the irrefutable conclusion that a different sentence is warranted between the two men.

> b. *The different impact of the sentences upon each defendant*

The Court imposed a 78-month sentence upon Mr. Shuklin. For the reasons set forth below, that same sentence would have an entirely different impact upon Mr. Verlan were it imposed upon him. An estimation of how the sentence will impact each man differently may assist the Court.

> (i) Mr. Shuklin

Mr. Shuklin was sentenced by the Court back in May of this year and was transferred to FCI Miami:



As discussed in Section (C)(3) above, FCI Miami provide inmates with classes and programming, library access, educational and vocational opportunities, better food and medical care, and the ability to exercise and maintain personal and spiritual heath, all in a low security, campus-like environment where inmates can move around freely. According to the BOP's website, Mr.

Shuklin's release date is currently scheduled for February, 2024. This calculation does not, however, include the six months of community-based corrections, either a halfway house or home detention, which are a standard element of such a sentence. Mr. Shuklin is also now able to earn First Step Act "good time" toward his early release as the programming that drives that initiative is available to him at FCI Miami. Upon information and belief, Mr. Shuklin has also resolved his immigration issues and expects to be released back into the Miami area and the luxury home he shares there with his wife. (*See* Doc. 249, Verified Petition and Claim of Third Parties Tatiana Rakhmaninova and Independent Van Lines, LLC). In short, Mr. Shuklin will be living in Miami with his wife by August, 2023, if not sooner, based upon his ability to earn additional days of credit toward his early release.

        (ii)    Mr. Verlan

Mr. Verlan remains in the Butler County Jail as discussed in Section (C)(3), above. He is locked down 23 hours a day in a small room with 15 other men, with access to programming, no education, *extremely* limited access to medical care, little to no access to exercise, and *zero* access to fresh air or sunshine. Mr. Verlan has an immigration holder and has already been denied political asylum. That means that he will never be eligible for any community-based corrections, house arrest, or half-way house placement. It also makes him ineligible for all First Step Act good time and related programming. The only benefit he is allowed to receive is the 85% good time calculation applied to all inmates. And once he is ultimately released, only deportation back to Moldova awaits Mr. Verlan. The PSR indicates that Mr. Verlan's hometown, where he plans to live with his father, is approximately 10 miles away from the Ukrainian border.

Mr. Verlan readily acknowledges that it was his choices and illegal actions which placed him in the predicament he finds himself in. He does not ask the Court to feel sorry for him. He

13

does, however, ask the Court to consider that imposing the same sentence upon him as it did upon Mr. Shuklin is not imposing the "same" sentence given all the differences set forth above. In the end, Mr. Verlan has already acknowledged his understanding that he will be deported and will sign anything he can to hasten that process. As it is, he will likely be detained in some ICE holding facility for several months while he awaits transportation back to Moldova.

D.     *Conclusion*

For all the foregoing reasons, Mr. Verlan respectfully asks that the Court consider a sentence of 60 months. That sentence, when served according to the BOP's "good time" calculation of 85% is almost exactly equal to the 51 months which Mr. Verlan has served in the Butler County Jail. A sentence of "time served" is therefore the equivalent to that 60 months sentence and will allow Mr. Verlan to begin the process of being deported back to Moldova.

Respectfully submitted,

_____
Paul M. Laufman (0066667)
LAUFMAN NAPOLITANO, LLC
4310 Hunt Road
Cincinnati, OH  45242
(513) 621-4556
(513) 621-5563 Fax
plaufman@LN-lawfirm.com
*Counsel for Defendant Serghei Verlan*

Certificate of Service

I hereby certify that a copy of the foregoing pleading was electronically filed on the 12th day of December 2022. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

_____
Paul M. Laufman